Good morning, Your Honors, and may it please the Court. Good morning. George Kimbrell, on behalf of the petitioners, I will be handling our FIFRA arguments, and my colleague Paul Achitoff will be handling the Endangered Species Act arguments. Do you have a proposed time allocation? We, of course, will keep our own clock, but our plan is for each to speak for seven minutes and to save six minutes combined for rebuttal. All right. EPA's registration of Monsanto's Xtendimax approved for the first time the spraying on growing cotton and soybeans of dicamba, of these crops now genetically engineered to be resistant to this pesticide. Its first season was unprecedented in the amount of drift damage, with over three million acres of U.S. farmland, including many crops and trees, damaged. As one agricultural expert said, we had never seen anything like this before in our agricultural history. State experts told EPA and gave them studies showing I'm sorry to interrupt so quickly. I'm reading from the brief filed by Monsanto, bottom of page three, top of page four. The brief writes, quote, to the extent the complaints, this complaints of damage to fields from the dicamba. To the extent that complaints cited off-target movement of pesticides, moreover, nothing in the record demonstrates that Xtendimax, that is to say the M1768, with its lower volatility formulation was the cause. Is that right? How do you respond to that? Because you're telling me there's enormous damage coming directly from this, and they're saying there's nothing in the record that shows that there's any connection to them. Yes, Judge Fletcher. I think the record has a plethora of evidence that is specific to Xtendimax in particular. For example, as I mentioned, several university scientists, agronomists from the University of Arkansas, Tennessee, Missouri, they all submitted studies to EPA. Those are at ER 295 to 343, for example, where they tested the volatility of Xtendimax in particular and showed that it was causing vapor drift and causing harm. And when did those studies come out? In the summer of 2017. So after the application the first summer. Right. I mean, that was the first time that the scientists had, the independent scientists had a chance to ever test it. Right. So there are two different time frames that are relevant. One is what was in front of the EPA when it approved the temporary registration in 2016, and the other is what did we learn afterwards. And as I read the statement here, they're saying there's nothing in the record that tells us there's any damage afterwards, and you're telling me that's just wrong. Absolutely, Your Honor. I think there's a plethora of evidence. In addition to what I cited, I think that I would point the court to ER 337, 302, 345, 361 to 362. Those all talk about Xtendimax in particular. Can I ask you then, this timing issue is bothering me a little in two different contexts. So let me start with the most imminent one, and that is that the two-year period expires on November 9th, correct, 2018? Yes, Judge McKeown. A couple of months from now. Yes. Okay. So at that point, this regulation will no longer be effective, is that correct? Yes, Judge McKeown, unless EPA takes further action which would extend the registration to 2021. But if they were to take further action to extend the registration, would they need to go through the whole process of notice and comment and foundation, or is there some expedited process where magically on November 9th, there's a new regulation on November 10th? I would ask my colleague at EPA the same question. I will be. Your Honor, I don't know. I will say that in 2017 there was no notice and comment on the amended registration decision, which is the operative license of the pesticide currently in front of the court. If this were to expire and evaporate, if you will, in terms of the regulations, that at least by November 9th it would be moot. I think if it expires, then I agree there's no lawful license for the pesticide. Okay. So then let me ask you another question, and that's a more practical question, and that has to do with between now and November, because my understanding is the summer is the growing season for these soybeans in the United States, correct? Yes, Your Honor. And then they'll go off and harvest them maybe this fall, but at that point they've already used for the summer season this chemical component that you're challenging. Is that right? Yes. So will anything happen between now and November, a practical matter as regard to the dissemination and use of this chemical? Well, no, not in the fields. I think you're right that the summer season is when it's really active, so it would be more dormant during the winter until we get to the summer. So certainly the planting season for 2019 is a critical season because it's upcoming. Yes. So now I want to go to the second timing issue that I'm interested in, and one alluded to by Judge Fletcher. So with respect to your challenge, the 2016 conditional registration, do you agree with respect to that registration that we need to look at evidence that was in the record at that point? I think it's one registration, it's one action, and so we think the whole of the record requires to be reviewed. So the critical decision in 2017 has to include the record of harm in 2017. Certainly we believe there was record evidence in front of the agency for the initial registration that we pointed to in our briefs of the foreseeability of the harm. The summer 2017 was confirmatory in providing what we anticipated and said and told EPA and many did was going to happen. So let's kind of try to parse that out because I can see the continuum issue here. But in the, I guess I would call it the amended labeling requirement, I don't know if that's an appropriate moniker for it, but in the 2017 labeling requirement, there's some additional information, correct? And then is there further additional information after the 2017 labeling requirement? So the amended registration. Then and now, so to speak. So the amended registration would be the end of the administrative record. So that's what we have, too, and that's what we've provided to the court. And we think that that record evidence is very important and needs to be reviewed in the decision. The critical component is that EPA made no new findings, no new assessments, no even explanatory rationale why it did what it did in 2017 and why it would stop the harm. I think the decision in 2017 was effectively an admission by them that what they had done originally was not sufficient. But the problem is, even if they made it probably better, that's not the FIFRA standard. The FIFRA standard is supported by substantial evidence. And here, there is no evidence to support what they put in place in 2017. And most importantly, their reliance back on the 2016 assessments doesn't take into account, it can't grapple with the 2017 record evidence. So factually, it's inconsistent. Legally. How would they do that? In other words, obviously they were triggered by information, presumably, supplied by scientists and others to change the labeling requirement. But in doing that, are we supposed to use that evidence to benchmark what happened in 2016? No, Judge McEwen, we're not trying to use post-decisional evidence. I think the critical way to understand it is that they have incorporated those 2016 assessments without change in the 2017 decision, and they don't account, they can't account for what happened. So, you know, fundamental precepts of administrative law say agencies have to explain and support their rationale. And here, there is none of that. There's nothing why what we've done is going to work. With respect to the decision in 2016, not yet looking at the amended label in 2017, it appears that the information that the EPA had with respect to volatility of the Extendimax, the 1768 formulation, was based on studies of two fields by Monsanto, one in Texas and one in Georgia. Yes, Your Honor. I read the summary by EPA of its analysis of those studies, and I couldn't find the acreage. Professor Mortensen says one is 3.4 acres, one is 9.6 acres. Is that the right acreage for those studies? Judge Fletcher, I believe so, and I just want to note I'm eating into my colleagues' time, so I'll answer your question and then sit down for now. Well, I've got a little follow-up. Oh, absolutely. And it's a little bit of a set-up so the other side knows what's coming. Okay. Well, I think that's- So first off, in your view, that is the acreage. I just couldn't find it here. It's 434 would be the critical page, ER 434, that talks about those studies and how they went past or exceeded their own harm threshold, which this Court has said is not proper in pollinator stewardship and in the NRDC case. Okay. Thank you. Okay. Thank you. Good morning, Judge McEwen. Good morning. Judge Hawkins, Judge Fletcher, Paul Achitoff for petitioners. I'll be addressing EPA's violations of the Endangered Species Act, Section 7A2. I'd like to try and touch on three points. EPA made hundreds of no-effect findings with respect to species and critical habitat that are contrary to the record. EPA erroneously defined the action area contrary to the record to exclude most species and habitats from any consultation consideration. And third, EPA, without legal basis, categorically exempted itself from consulting on any critical habitat. Section 7A2 required EPA to consult the expert wildlife agencies if the Extend-A-Max registration, quote, may affect any of the approximately 900 listed plants and animals and about 500 designated critical habitats on millions of acres across 34 states where Extend-A-Max was authorized for use. This court en banc in the Kurok tribe case defined the standard for may affect as, quote, any possible effect, whether beneficial, benign, adverse, pardon me, or of an undetermined character. For almost all of the species and all of the critical habitats, EPA declared Extend-A-Max would have no effect. This was arbitrary and capricious and contrary to law because while EPA says it found no effect, there's no evidence whatsoever in the record to support that. Let me understand what's going on here. It did analyze it with respect to certain listed species, but the species that it excluded I think were the species that would somehow be off the treated fields. My understanding is that they said any species that might be off the treated fields we won't consider because the untreated fields won't be exposed to this formulation of dicamba. Is that my correct understanding of what they did? That is correct, Judge Fletcher. So then we have to decide what's the evidence that there would be no effect on the untreated fields from the Extend-A-Max? On the untreated fields. Well, that's to say the treated fields clearly have it, and they did analyze, okay, what about the animals who live in those fields? But they say there's simply no effect for the animals or plants off the treated fields because there's no consequence from the dicamba on the untreated fields. Right. Well, let's look at first the decision to exclude all of the animals and plants outside the treated fields. That was based on EPA's determination that mitigation would effectively reduce the impact, not eliminate it, but reduce the impact to below the no observed adverse effects level. Well, actually, I'm not sure of that. I'll just read you from ER 29. This is the EPA. These mitigations are known to profoundly impact any drift potential. In the aggregate, these formulations and labor requirements are expected to eliminate any off-site exposures. That doesn't say reduce them to a low level. It says any. That portion says any. I would look at EPA's brief at pages 35 and 41, citing ER 18, 31, and 721, where EPA found that its mitigation, quote, would effectively prevent off-field movement in amounts greater than the no observed adverse effect concentration, which, of course, is not the no effect standard. And I would add the fact that we know, based upon the record, which is before the court based on the 2017 growing season, that over 3 million acres of crops outside the sprayed fields were damaged by drift. And though all of those more than 3 million acres, EPA assumed wouldn't be affected. Now, the 3 million, I think you probably want to say by drift and volatility? Drift, right. Both spray drift and volatility. And all of that acreage is off the sprayed fields, and EPA assumed we don't have to look at any species or habitats off the sprayed fields. There's not going to be any harm. It knew in 2017, when it made its amended decision, that that assumption of no drift was grossly erroneous, and yet it didn't make any changes whatsoever to its Endangered Species Act assessments. It made no changes whatsoever to its no effect findings. It simply stood on them, and they were obviously wrong. Now, with respect to even the species that were on the fields, EPA consistently applied the incorrect legal standard. It did not look at the no effect standard. It didn't even try. What it did was it looked at what it calls the level of concern, which is a measure of harm that EPA creates under the FIFRA context and has imported into the Endangered Species Act context. And EPA finds no effect whenever its risk quotient, which is the likelihood of mortality, does not exceed its own level of concern, which is the risk of mortality acceptable to EPA. So what it actually found was not that there was no effect on the animals in the treated fields. What it found in every case where it did a refined risk assessment for animals that could be found in the fields, it found measurable risks to each and every one. For example, we've talked about the whooping crane in our brief. As an example, from the record, quote, a risk quotient of .11 does not exceed the chronic level of concern of 1.0. Consequently, a no effect determination is concluded for the whooping crane. There are identical sorts of findings for each of the animals. Is your point that this level of concern doesn't really equate to the no effect? Exactly. There is no evidence in the record that the level of concern equates to no effect. Although EPA and Monsanto say over and over again, we found no effect, we found no effect, there is no evidence showing that. And in fact, when their findings show that something has a risk quotient of, in the case of the Virginia big-eared bat, .63, that is a finding of a measurable risk. I might ask you to wrap it up. You're kind of into your rebuttal time, but don't panic, because I am going to give you both the full rebuttal time. I'll just add it to theirs. So if you'd wrap up your argument, I appreciate it. I appreciate it. The record is replete with admissions from EPA and even from Monsanto in their brief that what EPA actually looked for was adverse effects, not no effect. They consistently said so, and we've cited in our brief examples from the record. Adverse effects is not the consultation standard. The no effect standard is extremely low, and it requires consultation for any effect, even those that cannot be meaningfully measured or evaluated and are extremely unlikely to occur. EPA didn't look for those effects, and therefore its no effect findings are unsupported. Thank you. Good morning, Your Honors. I'm Brett Grosko on behalf of the Department of Justice, Environment and Natural Resources Division, here on behalf of the Environmental Protection Agency. Your Honors, EPA's decisions in 2016 and 2017 were based on ample evidence in the record. This is based on a voluminous record that this Court has to consider. The petitioners, on the other hand, are looking to use anecdotes and reports that were unconfirmed and investigations that were uncompleted to cast aspersions on EPA's decisions. But this Court's decision has to be based on EPA's scientific analysis. With respect to EPA's evidence in 2016, it did field studies for two fields, one in Texas and one in Georgia, and I'm looking at the EPA's analysis of that. Apparently they did one application on each of the two fields. They got data as to impact of dicamba off-site on the Texas field, but refused to provide it on the ground that there was dicamba found, but they thought it might be coming from some other source. So the only data we have is from one of those two fields. Is that enough? That doesn't tell me very much, given the great danger that everybody knew that dicamba posed to post-emergent fields. And it turns out, of course, the danger was there. Arkansas, as I understand it, looked at the same studies and said, sorry, that's not enough. We're not going to allow it on our state. And you guys turned out to be wrong. Respectfully, the Court's role is to look at what evidence was in the record. That's exactly what I'm looking at and what I'm asking you about. Correct. And EPA looked at those studies. First, there was a human dome study that has not been questioned by the petitioners, and that is a study whereby it's in an enclosed area and there are extrapolations made based on the concentrations found. That's not in dispute that that one is valid. I'm asking about the real-world studies, and apparently we've got only two, if I can call it that, the two different fields, and the actual off-site contamination in Texas, Monsanto refuses to provide you that data. Right. But, I mean, at the end of the day, the Court's role is to allow EPA to decide what the best available science is, and that's the precedent. I understand that in the abstract. Just talk to me about the studies that I'm just talking to you about. Should it be enough when you've got two fields, Monsanto refuses to allow others to do the studies, as to one of the studies, they have data that they refuse to provide to you, and as to the other, they give it to you, and it's only one application. Your Honors, these studies were sufficient under the standards of FFRA and the ESA. These studies have not been contradicted. There have been no other studies cited to by the petitioners. Well, I'm not sure we need studies. We now have 3 million acres' worth of real-world experience. I'd like to address that, Your Honor. Thank you. The petitioners, if you look at the citations actually from their briefs, what they are citing to are, first of all, citations concerning previous versions of DICAMBA that were never formulated to be used after post-emergence. And every single citation is like this. Or, the alternative, they're citing to these reports and anecdotes, reports from the media and the like. For example, ER-777, those were their comments from 2016. The Center for Food Safety is one of the petitioners. They're there citing to the potential that growers apply herbicides to adjoining fields by mistake. That's one possibility for what happened in 2017. Similarly, at ER-442 through 44, the State of Georgia is reporting to EPA at the time. We have a virtual cacophony of information coming to EPA, and EPA is attempting to sift through it and take action as swiftly and deliberately as possible, based on the latitude that it has under FFRA and the time frame that it's working with. In Georgia, the training worked. I know there's a lot to be said about the standard of review and, you know, cherry-picking studies and all that, but can I just cut to the chase on the practicalities of this lawsuit? So I'll ask you the same question that I asked the Family Farm Coalition, and that is when the regulation and the 2017 amendment expire on November 9th, what happens? So, Your Honor, there are really basically three chapters to this. There's Chapter 1, 2016, Chapter 2, 2017, where EPA is deluged with information. Investigations that have begun in the states but haven't been completed. EPA may have preferred a more perfect system for channeling information to it, but that's simply not the way the system works. EPA was sifting through this and looking to make the best decision it could in the two months it had before growers started to purchase it. That doesn't get to my question. Correct. I'm sorry. That gets to the prior argument. Thank you. So in 2018, this will expire. EPA put a two-year limitation on this for a reason, because it wanted to be able to take a look. At 2018, November 9, this regulation expires by its very terms. So were EPA want to extend it, would it then need to go through notice and comment and looking at what was learned post-2017 amendment, or what would happen as an administrative regulatory posture? So here's what I can tell you about what I know. In 2018, the expiration date is November 9. Certainly, a decision will be taken by then. But EPA intends to actually render a decision in the near future in order to enable growers to make seed-purchasing decisions. And so that will be made. Now, notice and comment is something that I'm not aware of as to whether a decision has been made. Let's just stop there, then. So that 2018, this regulation as we know it will expire. Correct. Okay. It will either expire or there will be a renewal. But either of those will happen. So if there's a renewal of it, will it be based on the information we have, or will it be a new order that would need to be appealed? It would be based on an entirely new record. EPA is sifting right now. Well, that's really my question. So right now, as they've indicated and I asked, the growing season is over. We're worried, of course, about the 2019 and what will happen and what can and can't be used in 2019. But this order, as I understand you, will not affect the subsequent growing season because it expires. Correct. It will be an entirely new decision based on an entirely new record. There have been new studies that have come about that are actually analogous to and on the same sort of level of the ones considered in 2016. There have been all the reports that the petitioners are referring to that do not, did not give EPA sort of the ability to go back and question its decisions in 2016 will also be considered. EPA is considering all of this. It's done extensive outreach to the states. Is it moot as of November 9th? It very well could be, Your Honor. That's something that. No, wait a minute. No, I mean. Very well could be isn't the same as yes. Anything could possibly be. I mean, it's kind of a yes or no as to whether EPA would say it's moot. What would be the legal basis for extending it if it expires by its own terms? Well, I'm trying to understand your question, Your Honor. I'll ask it differently. How's that? Thank you. Is there any basis that you know of that this particular regulation would not become moot upon its expiration in terms of a challenge to it? Honestly, we'd have to look at, I think, what is decided, and there would probably need to be briefing on that. But there are certainly some scenarios where it could become moot. I think we would have to look at it then. I'm still working on Judge McKeown's question because that makes a big difference to us. I mean, if our decision on this two-year temporary registration makes no difference, it makes no difference. Is there any notice and comment rulemaking now underway with respect to a successor registration? I really don't know to what extent that. There's nothing on the website. There's nothing publicly out there. So we're not asking you for confidential things. I'm working sort of we're in the realm of outside of the record, Your Honors. Anyway, they're working on something. What I can say, a new decision will be coming. It will consider all of the evidence that petitioners have submitted, all of the evidence that has come in from other sources. And EPA, again, has done extensive outreach, not just to. I think the simple answer to my question, unless I didn't phrase it quite right, would be this order will expire, but in all likelihood the EPA will have another order, which will be based on a different record. Is that a fair characterization? You know, at this point, it would be speculation, pure speculation for me to say what exactly EPA's decision will be. I didn't ask you what it would be. You told me there's likely to be a decision. I don't know what it will be. You don't know what it will be. But is that incorrect to say there's likely to be some follow-on decision related to this pesticide and these seeds? I mean, that's a pretty simple question. I'm sorry if I'm being dense, but, you know, either it will expire by November 9th, it will be. In which case it would be moot, right?  This record, okay. Does the EPA have the authority to extend this registration without notice and comment? Honestly, that's something I haven't looked into, Your Honor. I'd be happy to brief it. I think that that would be something we would want to look at carefully. Well, even if it, apart from notice and comment, if the regulation expires by its own terms, is there any authority simply to unilaterally reissue something from an administrative law point of view? I believe that there are opportunities to amend without notice and comment. But, again, this is a question that was not briefed. But it seems to me that when you show up in our courtroom at the end of August and there's going to be a termination of this in two months, it doesn't need to be brief. We just need to know an answer because, you know, certainly I think it affects what may go on here. Let me just ask you another timing question, but not one. I think this one you'll be able to answer straight up. Are you reserving time for your colleague? Yes, Your Honor. And how much? Eight minutes. Okay. You have a few more. Okay. Thank you, Your Honor. You have 14 seconds. Well, I'll give you a minute or so because we gave them a little leeway. Okay. So, Your Honor, again, I was getting back to the idea that there were really three chapters here. First, the 2016 decision, and second chapter, the 2017 amendment, where EPA did everything it could, did its utmost in a very short time frame under the framework provided under FFRA to amend this label and get moving and take all of the reports that were coming in and look at them and try and decide what to do next. They say you didn't even use the right standard, even forget what the reports were. They said this notion that you ultimately decided that there was no effect is not really coextensive with the fact that you didn't have a high level of concern. Those are two different standards, and, of course, the statute uses one, not the other. Judge McEwen, that argument is respectfully illogical. It goes against the grain of the legislative history as to what that amendment was about of FFRA, and it goes against the grain of the actual language of the statute. First of all, EPA used the unconditional registration standard, which is to say whether the registration would generally cause adverse effects to the environment. That is a holistic analysis of whether there is going to be a cause of an effect from the registration. On the other hand, for conditional registrations, these are those where there seems to be there are data gaps that need to be filled and will only remain viable until that information is provided. That's the standard is for whether there's going to be a substantial risk of an increase, a risk of adverse effects to the environment. I'm afraid I've got one more question. I apologize for taking you over, but I bet you're going to get your eight minutes anyway. My question is, with respect to the record that we can consider in evaluating the challenge to the regulation or the authorization now in front of us, do we consider only what was in front of the EPA in 2016, or do we consider what was in front of the EPA when it did the amended label in 2017? Thank you, Judge Fletcher. There are two separate questions that should be considered separately. The petitioners would like to meld the two together, but, in fact, the 2016 decision should be taken on the basis of the record that was before EPA at that time. And the 2017 decision to amend, which only ratcheted up the standards, needs to be looked at on the basis of the record that was before EPA in 2017. Okay. One quick question. Is it fair to say that the information that came to light in 2017 didn't cause EPA to revisit the temporary registration? Well, first of all, EPA knew that what it was getting was a- You have a yes or no in your vocabulary? No, it did not. No, it did not. Oh, I need to know. And the petitioners- Thank you. I think he got the answer. He wanted yes or no, so I appreciate that. And then let me ask you, if you would, please, can you just start the clock over and put eight minutes on that? Thank you. Thank you, Your Honors. Thank you. May it please the Court. I'm Richard Bress. I represent the intervener, Monsanto. I would like to address, first, the mootness issue, second, the issue of what happened in 2017 and what importance it has or doesn't have. Third, I'd like to spend most of my time, if I can, on the issue of subject matter jurisdiction. I'll get to that third, but I think it actually is dispositive of this case. So, first, mootness. I do have a yes or no answer for you, Your Honor. Regardless of whether EPA, on the basis of a new record, determines to extend the registration forward or decides instead to let it expire, this case will be moot either way because the current record and the current decision will no longer have any effect. As has been discussed, and I can confirm from Monsanto's standpoint, the growing season is over right now, as EPA has suggested their deadline. Or just in the harvest season, possibly, but no actual growing, so to speak. Well, I can be even more technical. Basically, the canopies of the plants are high enough that the weeds don't need to be addressed through pesticides. And EPA, as it has suggested, is going to decide by November 9th, but actually, as they've suggested, probably earlier than that because farmers need to know what kind of seeds they can buy for the next season. So this case is really shortly to become one that has no effect. Let's talk about 2017, Judge Fletcher. You asked a number of questions about it. I think most of what's— My first question was with the sentence that you wrote that I read, that there's nothing in the record to connect any of this crop damage to extend-to-max. Yeah, and that was part of what I would like to address, Your Honor. What we have in the record from 2017 is that 3,000 acres of crops were damaged, allegedly. Again, it's not an official number, but that's the number that continues to be thrown out. We appreciate that there were a number of incidents in a number of places. To start with, Your Honor, there were three different pesticides used during that period that had dicamba in it. Monsanto's extend-to-max is less than 50 percent of the market for that. And so to the extent—first of all, we're talking about incidents. We're also talking about Engenia, for example, made by BASF. That's a different formulation. It doesn't have vapor grip, et cetera. So—and that was the—by the way, Monsanto's extend-to-max wasn't used in Arkansas, where 900,000 of those alleged acres were affected. And yet— I understand— So to get to the yes-no answer, Your Honor, on your point, we don't— Can I interrupt you? Please. Your sentence was a very strong sentence. To the extent that complaints cited off-target movements of pesticides, nothing in the record demonstrates that extend-to-max was the cause. Yes, Your Honor. We stand by that. Nothing in the record demonstrates that. There have been no looks— So you're kind of beyond a reasonable doubt in terms of what demonstrate means? Your Honor, certainly there are plant scientists who came out with views that they believe— to a point where it could have been a cause for some of those incidents. We dispute that. We've done our own studies, Your Honor, that will be taken into account this fall. The states have come forward as well, Your Honor, with lots of other reasons for the incidents, including failure to clean the tanks, misuse of the instructions, et cetera, et cetera. So, yes, Your Honor, we do stand by it. But let me address, I think more importantly, for 2017, it's really a lot of color thrown up by petition— if you don't mind, I'd like to stick with 2016 for a minute. Could you give me more information, if you have it, as to why the information as the dicamba contamination off-site for the Texas field was not provided to the EPA? Your Honor, the information for both Texas—there were two fields in Texas, two in Georgia, so not one for each but two, and all four of them were provided. Please, let me interrupt you one more time. There were two fields in each place. One field had the old formulation. One field had the new formulation. So the new formulation was tested on one field in Texas and one field in Georgia. And the information, the data that you got as to the off-site contamination for Texas from the 1768, the extendamax, was not provided to the EPA. Could you give me more information as to why it was not? Your Honor, I don't—I'd accept, of course, Your Honor's citation. I'm just reading from the EPA. But I don't think it's correct that we failed to provide them the data from the Texas tests. EPA studied all of the data for both Texas and Georgia. EPA came away with a conclusion, if you look at page 463 of the ER, that these tests were done, and it wouldn't have known this if it didn't have the data, under near-idealized conditions for volatilization. So these were tests that would show how much you could possibly conceivably have of volatilization. They then ran it through using their meteorological information through their own calculations to come up with an even higher degree of confidence, above 90 percent degree of confidence. That's how they came out with the numbers, Your Honor, as far as I know. There may be allegations to the contrary, but if so, I really don't know. Would a place to find that then be to go to the actual administrative record? I mean, I'm just reading from what the EPA writes. These uncertainties could be addressed through submission of the additional off-field data sample from data from Texas. I mean, you didn't submit it. I mean, it's just right here on the EPA. Additional. Your Honor, I do believe that you used the word additional. Yes, I did. What I'm suggesting is not that we hid all data, but there may be additional data that EPA would have liked to have at the time of writing the report. I'll read the previous paragraph. Include the lack of off-field sample data from the Texas studies to determine volatilization. It just was not provided. I mean, you can read this if you like. Your Honor, I don't know if they did it exist or not. Your Honors, I don't know the answer to that. Well, I know what the EPA said. The EPA said that you had it, but that you're not providing it. I didn't say that. No, no. It says what it says in the record. Well, no, what the EPA says is that you reported that you had the data, but that you suspected that there was contamination independently from other dicamba, so you weren't submitting it. That's what the EPA says. No, no, Your Honor. EPA doesn't say that we held back data from them because we suspected something about it. In fact, EPA found that the Georgia tests showed a greater degree of volatilization than the Texas tests, and therefore they used the Georgia tests for purposes of determining the exposure levels that would exist within five meters of the field under dicamba. If I could. I'll just read it to you if you like. This was not done for any of the Texas field volatility studies. While all field samplers were included as part of the studies, the data were discarded by the study authors, briefly stating the samples possibly contained dicamba from other sources than volatilization. I mean, that's what the EPA says. From other samples. So the point was, Your Honor, again, I'm trying to pull this together while listening to you, but what you're saying is that they determined that the dicamba that might have existed outside the field may have been contaminated by matters other than volatilization. Therefore, the study itself was a contaminated study. That's right. And they couldn't have drawn conclusions from it.  Because the data itself, it sounds like, was suspect because it could have involved dicamba that moved there, for example, by spray drift as opposed to volatilization. And that may be right, Your Honor. That's what I've been telling you for the last five minutes. All right, Your Honor. I'm sorry I didn't. If I could, and I know that I'm riding on lost time here, but I know that the other side fortunately got a bit of time. I believe this case should be decided as a matter of subject, more a matter of jurisdiction, and I don't think this Court should go beyond that. The reason is that the order here, the notice of approval came out November 9, 2016. It is undisputed in this case that the registration was effective as of that date. Under the statute, Section 136NB, the petitioners had 60 days from the date on which the order was entered. They waited 72 days instead of 60 days. They were 12 days late. There's two excuses that have been given so far for this. One, EPA has taken the position that it's possible for an order to be entered, I mean, effective, and yet not entered for purposes of allowing judicial review until 14 days later. Now, EPA said something very different when it came out with its regulation, and I'll cite here, 50 Fed Reg 7268-7269-1985. It's in our brief as well. EPA said, EPA recognizes that the courts would not follow the rule of deferral of the issuance date if EPA sought to make a rule or action effective prior to its issuance for judicial review purposes. Now, the reason EPA recognized that back in 1985 is that the agency has no power or authority to postpone the availability of judicial review until two weeks after it makes its orders effective. As this Court well knows, there's a strong presumption in favor of judicial review. Congress may be able to create such a period, but the agency can't do it itself. Petitioners, for their part, have a different argument. They say, well, they understand that someone that wants to come in immediately can come in immediately and have preenforcement review. But in that case, they say they would just disregard the 14-day period that's in EPA's rule for entry of its orders. The problem with that is an order is entered as of a date certain. As we've suggested, it's entered when the order becomes effective. It doesn't change, depending on what a third-party petitioner, when they choose to file their petition for review. It's not the case that the order was entered 14 days later if they chose not to file their petition until 14 days later, but if they chose to file their petition 14 days earlier, it was entered at that time. That's not how the law works, nor does it work in a way that allows people to come in early and extend. Therefore, the period is extended from 60 days to 72 days. Congress has provided ---- Thank you. I have your point in mind. Thank you very much. So now we have the rebuttal from the Family Farm Coalition, and we'll have you try to stick to your time this time because I'm giving lots of it back to you, okay? So six minutes, please, and I think you want to split it three and three. Is that right? No? I think it will just be me, Your Honor. All right. That's even easier. Thank you, Judge McKeon. So, yes, I'll try to make a few points. I'll start where we left off with 40 CFR 23.6 just very briefly. Monsanto's interpretation is contrary to the regulation's plain language. EPA's interpretation of it, this Court's interpretation of it twice, including by the appellate commissioner in this matter. Basically, the regulation says on its face, unless EPA explicitly provides otherwise, you add two weeks from whenever the registration is signed. So if you look at ER1, you've got a signature, you've got a date. Explicit means unequivocal. And so there's absolutely no, I mean, they may have issue with the regulation, but the regulation says what it says. So we are timely for both petitions. With regards to the mootness question, Judge McKeon, I want to get back to that. I think it's vital that this Court decide this case. I think we have expedited this case and done our best to get it in front of this Court as quickly as we can. We had extra time that was taken for the government to produce the record in this case, and they've already extended it once with the 2017 decision. So, you know, we anticipate they're going to do something potentially similar to that again without notice and comment, but it's going to be another amendment to this very same action. Just like the 2017 decision superseded and incorporated the 2016 decision, that is what's going to happen again. But what we need is guidance from the Court so we don't face the same situation again with regards to lack of compliance with FIFRA and the Endangered Species Act. Help me understand the consequence. Let's imagine, I'm not predicting, let's imagine that we agree with you on the merits, and let's imagine that we enter a decision to publish the decision that's on the street on November the 1st. What possible consequence will that be? I think, Your Honor, it will give guidance to the agency on how to do this the right way, compliance with FIFRA and the ESA. We don't give advisory opinions. Fair, Your Honor. I didn't mean it in that manner. I just meant that right now this is a live decision, and that's all we know. But if and when there was a further decision. Live decision facing a certain death? Fair point, Judge Hawkins. I guess I would say even under the capable of repetition evading review prong, it's very clear that that standard would be met here, given that the first prong is the challenged action is too short in its duration to be fully litigated, and there is a reasonable expectation the same parties will be subject to the same action again. Now, that's what we have here. If they extend this, it's going to continue to be used in the same way. So I think it is vital that the Court issue a decision here. Why shouldn't we wait until November 9th? Because it will have no practical effect on the planting dispersal of the herbicides. What if we were to wait until November 9th? And then we would have an answer to all these probabilities or possibilities. We don't know what the agency is going to do, but to the extent that the record is fully briefed and these arguments are fully briefed and there's a reasonable expectation we're going to be here again before the spring. But maybe on a different record, in which case by the 9th we'll know that answer. But if there's a completely different record, then this would basically be moot. I don't think it would be a different record. I think it would be inclusive of this record. They claim they're going to consider the 2017 evidence in the next decision. They had to consider it now, this decision. It was not supported by substantial evidence for that very reason. So I do think going on to the other points very quickly, counsel for Monsanto said 300,000 acres. It is compiled by state agricultural departments that there was at least 3 million just of soybean acres. So those are maps at 375, at 419. So those 3 million include Arkansas? Yes, they do include Arkansas, yes. And I think for your purposes in terms of tracing it to this formulation, either Monsanto or the competitors have got some variation. I think we have to exclude those, don't we? Yes, Judge Fletcher, absolutely. But you've got hundreds of thousands of acres in Missouri in those maps, in Illinois, in Minnesota, in Nebraska, and in Iowa. What about the response to Monsanto's argument that you have the Georgia data, which then can be taken into account, and if it showed something different than the Texas data, which depending on how you interpret the APA statement, that that actually pushed them into a higher standard in effect? Well, our argument there, Judge McEwen, is simply that they set the harm threshold themselves. They called it the NOAC, the No Observable Adverse Environmental Concentration level. That was with the humidome study. And then their own studies at 464 exceeded that threshold, and they fudged it. They said, well, it's close enough. And this court has said repeatedly that in the neighborhood is not good enough. If you exceed your own harm threshold, EPA, it's not supported by substantial evidence. So, you know, that's the crux of our argument on that point. With regards to the other formulations that were mentioned, I think the critical registration here is the extended max registration. There was no notice and comment and no different risk assessments for those other formulations. They are all tiered off of these risk assessments and this approval. So we had no opportunity to comment on them. If we wanted to challenge them, we would have gone to a different court, the district court, rather than the court of appeals. Are the registrations for the others that are comparable to extended max, are they also limited to November 9th? Yes, Your Honor. The EPA amended their registrations exactly the same way with the same flaws. But the extent that we've got a mootness problem, it exists as the M2. Yes, Your Honor. So I see that I'm closing on my time. These were substantial errors of law under FIFRA and the Endangered Species Act, which has a higher purpose, Congress has said, than FIFRA. For those reasons, we ask the court to vacate the registration. Thank you very much. Thank you very much. Thank all counsel for your argument this morning. Case just argued, National Family Farm Coalition versus the EPA, and Monsanto as a respondent intervener is submitted.
judges: Hawkins, McKeown, W. Fletcher